**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CECIL TIBBETTS and DAVID
THURBER,
                    *Plaintiffs-Appellees,*

            v.

THEODORE KULONGOSKI,
individually and in his official
capacity,
                    *Defendant-Appellant,*

            and

STATE ACCIDENT INSURANCE FUND
CORP., an Oregon corporation;
BRENDA ROCKLIN, individually and
in her official capacity,
                    *Defendants.*

No. 07-36067

D.C. No.
CV-06-00503-ALH

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
March 4, 2009—Portland, Oregon

Filed May 29, 2009

Before: Susan P. Graber, Raymond C. Fisher and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Erin C. Lagesen, Assistant Attorney General, Salem, Oregon, for appellant Theodore Kulongoski.

Gregory A. Hartman and Aruna H. Masih, Bennett, Hartman, Morris & Kaplan, LLP, Portland, Oregon, for appellees Cecil Tibbetts and David Thurber.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Defendant-Appellant Oregon Governor Theodore Kulongoski appeals from the district court's order denying his motion for summary judgment on the ground of qualified immunity. Plaintiffs-Appellees, who are former employees of the State Accident Insurance Fund, brought this action pursuant to 42 U.S.C. § 1983, alleging, among other claims, that Governor Kulongoski violated their Fourteenth Amendment due process rights by making stigmatizing statements about them in two press releases without providing them name-clearing hearings.

Because the relevant parameters of a Fourteenth Amendment right to a name-clearing hearing were not clear at the time of the allegedly stigmatizing statements, we conclude that a reasonable official in the Governor's position would not have been aware of his alleged obligation to provide Plaintiffs name-clearing hearings. We therefore reverse the district court and hold that Governor Kulongoski is entitled to qualified immunity in this suit.

### Factual and Procedural Background

Plaintiffs Cecil Tibbetts and David Thurber (together, Plaintiffs) are former managerial employees of Defendant State Accident Insurance Fund Corporation (SAIF). SAIF is a part of the executive branch of the State of Oregon but is organized to function as a public corporation. The Oregon legislature created SAIF "for the purpose of transacting work-

ers' compensation insurance and reinsurance business" with Oregon employers. Or. Rev. Stat. § 656.752(1). SAIF is governed by a five-member Board of Directors (Board) whose members are appointed by the Governor of Oregon, Or. Rev. Stat. § 656.752(1) and (3), and who serve at the Governor's pleasure, *id.* The Board appoints a manager to run SAIF, who "serves at the pleasure of the board of directors." *Id.* Governor Kulongoski was Governor of Oregon at all times material to this dispute.

In the time period leading up to the events that are the subject of this appeal, SAIF was the subject of extensive media attention because of alleged scandals regarding the practices of its then-President, Katherine Keene. Charges of ethics violations had been filed against SAIF for its alleged failure to report its lobbying expenditures accurately, and a lawsuit had been filed alleging a willful failure to produce documents in violation of public records laws. *See Oregonians for Sound Econ. Policy, Inc. v. SAIF*, 182 P.3d 895 (Or. Ct. App. 2008) (hereinafter, *OSEP* litigation). In December 2003, Keene resigned from her position as SAIF's President/Manager.

After Keene's resignation, Plaintiff Cecil Tibbetts, who had served as Vice President for Human Resources at SAIF since November 1, 1995, was appointed to act as SAIF's Interim President/Manager by SAIF's Board. In April 2004, the SAIF Board responded to Governor Kulongoski's public demand for a report regarding some of SAIF's controversial policies and practices. In a letter to Governor Kulongoski, the Board questioned, among other things, SAIF's relationship with Associated Oregon Industries, a non-profit business advocacy group, with which Plaintiff David Thurber, Vice President for Policy Services at SAIF, was closely associated. The letter noted that the relationship "has been particularly controversial to some, and it therefore merits special attention." Some Oregon senators called for an "independent review" of spending, and the media reported that the Oregon Government Standards and Practices Commission had voted to initiate an

investigation into whether SAIF had under-reported the money it spent to lobby the legislature.

In June 2004, Mark Cohen, a former SAIF employee, filed an affidavit in the ongoing *OSEP* litigation which, among other things, accused Tibbetts of twice having ordered the destruction of certain records to avoid producing them in the *OSEP* litigation. Cohen further alleged that Tibbetts was concealing documents in his office and at his home to avoid disclosing them. The contents of the affidavit were covered by the media. SAIF officials called the allegations "erroneous, misleading and untrue" and described Cohen as a "disgruntled former employee who destroyed the documents without their knowledge." Tibbetts told a legislative committee that "[he] never told anyone to destroy documents that should have been retained." Governor Kulongoski thereafter issued a prepared statement to the media, reading:

> Unauthorized destruction of public records is against the law and cannot be tolerated by any public official. These allegations are very serious, and I believe they require immediate investigation. I am asking the attorney general to ensure there is a thorough investigation.

At the same time, Governor Kulongoski's spokeswoman stated to the press that "the governor is not taking a position on the allegations."

On August 12, 2004, Governor Kulongoski issued a press release announcing his intention to appoint Brenda Rocklin to replace Tibbetts as Interim President/Manager of SAIF. Preceding the issuance of that press release, Governor Kulongoski had explained to Board members that he thought Rocklin was an appropriate replacement because of "her credibility as a person that could fix things." He further told Board members that he thought that, given its problems, SAIF required some housecleaning and that Rocklin was the person

who could make that happen. During this conversation, some Board members reminded Governor Kulongoski that they alone had the statutory authority to appoint the President of SAIF. Nevertheless, after discussing the replacement, the Board voted unanimously on August 12, 2004, to appoint Rocklin as interim President and CEO.

In a press release following Rocklin's appointment, Governor Kulongoski stated that "[f]or months now, I have been very concerned about management decisions at SAIF," and "I have asked Brenda to conduct a top-to-bottom review of SAIF to make sure it is accountable to the public." The Governor further stated that "[t]o preserve [SAIF's] future, the public needs to know that SAIF is being run in an ethical and accountable manner — and the person to lead this effort is Brenda Rocklin." According to Rocklin's deposition testimony, in her discussions with Governor Kulongoski prior to accepting the position as interim president, the Governor indicated that "he hoped there would be some role for Mr. Tibbetts at SAIF Corporation, after he was no longer Acting President," but "that ultimately [Rocklin] would have to make that decision."

According to Board member Jon Egge's deposition testimony, in November 2004, after Rocklin's interim appointment, Governor Kulongoski contacted the SAIF Board and asked it to call off the search for a permanent CEO for SAIF, and to appoint Rocklin as permanent CEO. Another Board member, Mathew Chapman, testified that the Governor told the Board members that if they did not do so "ASAP," the Governor intended to remove them from their positions. At the Board's November 2004 meeting, Board member Chapman tendered his resignation, explaining that he opposed the Governor's efforts to install Rocklin as the permanent CEO. The Board took no action at the November 2004 meeting to appoint Rocklin to the permanent position. At or about this time, Board member Egge testified, Governor Kulongoski also informed SAIF Board members: "I've told [Rocklin] to

fire Cecil Tibbetts if he gets in her way or in any way impeded what she's trying to do here, and that goes for anybody else that gets in [her] way."

On January 27, 2005, Rocklin asked Tibbetts to resign. Tibbetts refused, and Rocklin terminated him. On the same day, Rocklin met with Plaintiff Dave Thurber and asked him to resign. Thurber agreed. The media contacted Rocklin and SAIF about the terminations. SAIF declined to elaborate on the terminations other than to confirm that Tibbetts and Thurber were terminated without severance.[1] Media coverage noted that it was unclear what motivated the firings, but that they appeared to be a part of the "housecleaning" that the Governor ordered — and that some Oregon lawmakers demanded. One article reported that Plaintiff Tibbetts was a "well-known" figure who, according to his critics, "had a hand in some of the consultant contracts that brought SAIF under fire." Another article mentioned that when Governor Kulongoski appointed Rocklin to conduct a review of SAIF, "[t]he Governor said that several controversies at SAIF prompted him to take action, including complaints about SAIF's spending on lobbyists and allegations that SAIF officials destroyed public records. The axing of Tibbetts and Thurber trims SAIF's management team to six members."

Nineteen days after Plaintiffs' terminations, SAIF issued its "Initial Report to the Governor: Review of SAIF Corporation." A section of the report dealt with operational deficiencies in properly maintaining public records. This section stated:

> Prior to our arrival at SAIF, a former SAIF employee, Mark Cohen, had alleged in an affidavit filed in Marion County Circuit Court that he had been instructed to destroy and conceal SAIF records.

---

[1]Under SAIF's severance policy, SAIF can deny severance pay to an employee "terminated for misconduct."

Specifically, he alleged that, on two occasions, his supervisor, Cecil Tibbetts, instructed him to delete documents from his computer to avoid having to turn them over in response to a public records request.

The report noted that the "investigation is still pending." The report attached a complete copy of the Cohen affidavit.

In response to the report, the Governor's office issued a February 15, 2005, press release (the 2005 Release), which in relevant part stated:

The State Accident Insurance Fund remains a key part of Oregon's future because it's one of the principal competitive advantages we have in growing the economy and providing jobs to Oregonians," said Governor Kulongoski. "If we are to preserve that future, the public needs to know that SAIF is being run in an ethical and accountable manner, and the initial report delivered to me today demonstrates a significant move in that direction."

The initial report focuses on administrative operations and documents findings and recommendations for actions in four key areas: 1) Board oversight and transparency; 2) work place diversity; 3) public records; and 4) contracting. The report also finds that SAIF is an efficient agency with highly qualified staff and management teams.

"I appreciate the candor of this report and the work of the Board of Directors, Interim President Brenda Rocklin, and the more than 800 employees who help SAIF carry out its mission everyday," said the Governor. "This report identifies the need for some significant changes in how SAIF conducts business on behalf of the citizens of Oregon and I look forward to working with the Board, Brenda and the legisla-

ture to make those changes so we can continue to make progress in strengthening accountability and transparency in this important state agency."

. . .

The initial report to the Governor is available on the SAIF website at www.saif.com.

In June 2006, the Marion County District Attorney's Office reported on the results of the investigation into the misconduct alleged in the Cohen affidavit. The District Attorney's Office reported to the media that the state police "conducted an extensive investigation into the allegations" but "did not find credible evidence that any individuals, or SAIF as an entity, intentionally withheld or destroyed public records." The report also stated that the investigation had uncovered some "serious issues regarding the credibility of Mr. Cohen." In response to this report, on June 6, 2006, the Governor's office issued a press release (the 2006 Release), which stated:

"I am grateful to the Oregon Police and the Marion County DA for answering my request for a through investigation of this case. The SAIF Corporation is critical to Oregon's economy, because it provides affordable worker's compensation coverage to our state's employers, benefitting businesses and their employees."

"Soon after I asked for the investigation, I made a change in leadership at SAIF. When I appointed Brenda Rocklin as interim CEO, I asked her to take strong measures to restore full accountability and transparency to the agency, and to put systems in place to protect public records. She has responded admirably. Over the next several months, I also appointed new members to the Board of Directors,

and charged them to support Ms. Rocklin in her efforts."

"As the result of these corrective actions, and thanks to hard work by many people in SAIF, the agency is now fully accountable to the public and the customers it serves. I want to assure Oregonians that even though the DA's report identified some troubling behavior, a new culture exists among SAIF's senior management and employees—a culture of honesty, openness, and a commitment to serving the people of Oregon."

Since these events transpired, Tibbetts has been unable to find employment. Thurber has not been able to find "comparable" employment.

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983. They allege that Defendants SAIF, Brenda Rocklin, and Theodore Kulongoski each violated Plaintiffs' Fourteenth Amendment rights by making stigmatizing statements in the 2005 Release and the 2006 Release (collectively, the Releases) without providing them with name-clearing hearings. Defendants moved for summary judgment on all claims. Rocklin and Governor Kulongoski asserted that they are entitled to qualified immunity with respect to the § 1983 claim. The district court disagreed, concluding that Rocklin and Governor Kulongoski violated Plaintiffs' Fourteenth Amendment rights by making stigmatizing statements without providing them with name-clearing hearings and that Plaintiffs' rights to these name clearing hearings were clearly established at the times Rocklin and Governor Kulongoski made their allegedly defamatory statements. This is an interlocutory appeal of the district court's order denying Governor Kulongoski's motion for summary judgment on the ground of qualified immunity.[2]

_____

[2]Rocklin and SAIF are not parties to this appeal.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction under 28 U.S.C. § 1291. We review a denial of summary judgment on the ground of qualified immunity de novo. *KRL v. Estate of Moore,* 512 F.3d 1184, 1188 (9th Cir. 2008); *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003). "Our jurisdiction is limited to questions of law, and does not extend to qualified immunity claims involving disputed issues of material fact." *KRL,* 512 F.3d at 1188-89 (citing *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (per curiam)). Where disputed facts exist, we assume that the version of the material facts asserted by Plaintiffs-Appellees, as the non-moving party, is correct. *Id.*

## DISCUSSION

### I

**[1]** Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. —, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

We analyze Governor Kulongoski's claim of qualified immunity under the guidance recently provided by the Supreme Court in *Pearson. Id. Pearson* held that "while the [previously required two-step] sequence set forth [in *Saucier v. Katz*, 533 U.S. 194 (2001)] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 818. Accordingly, "[t]he judges of . . . the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* Under the circumstances of this case, we adopt *Pearson*'s more flexible approach and proceed directly to an analysis of *Saucier*'s second prong, to determine whether the right asserted in this case was "clearly established" when the alleged stigmatizing statements were made.

## II

**[2]** " '[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Brady v. Gebbie,* 859 F.2d 1543, 1552 (9th Cir. 1988) (alteration in original) (quoting *Matthews v. Harney County, Or., School Dist. No. 4*, 819 F.2d 889, 891 (9th Cir. 1987)). " 'To implicate constitutional liberty interests, . . . the reasons for dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities.' " *Portman v. County of Santa Clara*, 995 F.2d 898, 907 (9th Cir. 1993) (quoting *Bollow v. Fed. Reserve Bank of S.F.*, 650 F.2d 1093, 1101 (9th Cir. 1981)). In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the Supreme Court held that a public employer can violate an employee's rights by terminating the employee if in so doing, the employer makes a charge "that might seriously damage [the terminated employee's] standing and associations in his community" or "impose[s] on [a terminated employee] a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Id.* at 573.

**[3]** If, in the context of employment termination, the employer publicizes a charge that "impairs a reputation for honesty or morality," then a liberty interest is implicated and the employee must be allowed to "refute the stigmatizing charge." *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998) (per curiam) (internal quotation marks omitted).

Plaintiffs point to two public statements made by Governor Kulongoski that allegedly stigmatized them. The first statement is the 2005 Release, issued nineteen days after Plaintiffs' terminations, which noted that "the public needs to know that SAIF is being run in an ethical and accountable manner," and that "the initial report delivered to me today demonstrates a significant move in that direction." The press release further stated that the Governor looked forward to working with the SAIF Board to "continue to make progress in strengthening accountability and transparency." The 2005 Release also stated that the SAIF Interim Report was available on the SAIF website. (The report included a section which summarized the Cohen affidavit, including Cohen's allegation that Tibbetts had directed improper document destruction.)

The second allegedly stigmatizing press release, the 2006 Release, was made following the completion of the criminal investigation into SAIF. The Governor's press release noted that he had made a change in leadership at SAIF, asked Rocklin to "restore full accountability and transparency to the agency," and that "[a]s the result of these corrective actions, and thanks to hard work by many people in SAIF, the agency is now fully accountable to the public and the customers it serves." It also noted that the Governor wanted to assure Oregonians that "even though the DA's report identified some troubling behavior, a new culture exists among SAIF's senior management and employees — a culture of honesty, openness, and a commitment to serving the people of Oregon."

As permitted by *Pearson* and required by *Saucier*, we analyze the merits of the Governor's qualified immunity claim by addressing whether the parameters of Plaintiffs' right to a name clearing hearing were clearly established at the time of the Releases. In this instance, such a determination turns on (A) whether the statements made in the Releases were sufficiently stigmatizing to Plaintiffs to trigger a name-clearing hearing, (B) whether the allegedly stigmatizing statements

were made in the course of Plaintiffs' terminations, and (C) whether the Governor himself altered Plaintiffs' legal rights or status. *See Campanelli v. Bockrath*, 100 F.3d 1476, 1479, 1484 (9th Cir. 1996); *see also Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994).

A

Governor Kulongoski argues that the statements made in the Releases were not stigmatizing as a matter of law. The Governor focuses on the fact that the statements "do not identify plaintiffs, but, instead, refer to practices at SAIF as whole, and they do not imply that plaintiffs were dishonest and immoral."

The Governor cites case law holding that "[o]nly the stigma of dishonesty or moral turpitude gives rise to a liberty interest; charges of incompetence do not." *FDIC v. Henderson*, 940 F.2d 465, 477 (9th Cir. 1991). While *FDIC* is a correct statement of the law, it is inapposite to this case. The statements made in the Releases do not charge incompetence; they speak of "ethic[s] and accountab[ility]," "strengthening accountability and transparency" and, after personnel changes were made, a "new culture" of "honesty" and "openness" at SAIF. This case is more analogous to cases where honesty, not incompetence, has been implicated by stigmatizing statements. *See, e.g. Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 777-78 (9th Cir. 1982) (holding that dismissal of high school teacher on grounds of "immoral conduct and sexual harassment" implicates liberty interest); *Walker v. United States*, 744 F.2d 67, 69 (10th Cir. 1984) (per curiam) (holding that discharge of Vietnam Veterans' Readjustment Act appointee for lying on employment form implicates liberty interest).

**[4]** Neither Tibbetts nor Thurber was named personally in the Releases. The law at the time of the Releases, however, was clear: stigmatizing statements need not name an

employee to be actionable, so long as the surrounding circumstances make clear that the statement makes particular reference to the employee. *See Algarin v. Town of Wallkill*, 421 F.3d 137, 139-40 (2d Cir. 2005); Restatement (Second) of Torts § 564A ("One who publishes defamatory matter concerning a group or class of persons is subject to liability if, but only if (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.").

**[5]** In this case, we express no opinion concerning whether the statements made in these Releases were stigmatizing as a matter of law. However, for purposes of our further analysis in this case only, we will assume, *arguendo*, that Plaintiffs were stigmatized by statements in the Releases.

B

**[6]** We next consider whether the statements in the Releases were made in the course of Plaintiffs' terminations. Our case law holds that "there must be some temporal nexus between the employer's statements and the termination." *Campanelli*, 100 F.3d at 1483. The *Campanelli* court refused, however, to adopt a bright line rule "that defamatory statements made by an employer any time after the date of termination are not made 'in the course of the termination.' " *Id.* at 1482. Instead, the court held that the statements must be "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." *Id.* Accordingly, we must evaluate whether it was clearly established that there was a temporal nexus between Governor Kulongoski's two Releases and Plaintiffs' terminations, or whether the statements were "too remote in time from the termination." *Id.* at 1483.

**[7]** The 2006 Release was issued sixteen months after the Plaintiffs were terminated, and after this lawsuit was initiated.

*Campanelli* held "that there must be some temporal nexus between the employer's statement and the termination" and that the stigmatizing statements cannot be too remote to be considered "in the course" of the plaintiff's termination. *Id.* We also note the holdings of *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 32 (2d Cir. 1994) (holding that a statement published five months after the plaintiff's termination was not made in the course of dismissal); *Hadley v. Du Page County*, 715 F.2d 1238, 1247 (7th Cir. 1983) (holding that a statement to the press six days after the plaintiff's termination was "at the time of" termination, but that a statement published two years later "was too remote in time to meet the stigma plus test"); and *Ray v. Tennessee Valley Auth.*, 677 F.2d 818, 824 (11th Cir. 1982) (holding that a six year lapse is long enough to sever the temporal nexus of statements to termination of the plaintiff's employment). We are persuaded by the reasoning of these out-of-circuit cases, and hold that sixteen months is far too remote from the terminations to meet *Campanelli*'s "temporal nexus" test.

The 2005 Release presents a more difficult question. The 2005 Release was issued nineteen days after Plaintiffs' terminations. This time frame falls between the week that *Campanelli* found to satisfy the required "temporal nexus" and the months and years that *Martz, Hadley,* and *Ray* found temporally insufficient. Governor Kulongoski argues that the "time interval of several weeks — which is over twice as long as the period in *Campanelli* — eliminated any nexus between the statements and the discharges." Plaintiffs argue that the terminations, the media coverage afterwards, and the Governor's press release afterwards can be seen as "so closely related" that "the discharge itself may become stigmatizing in the public eye."

[8] At the time the Releases occurred, a reasonable person in Governor Kulongoski's position could not have known by recourse to then-extant case law whether a stigmatizing statement made nineteen days after Plaintiffs' termination would

violate *Campanelli*'s "temporal nexus" test. Thus, we conclude that the parameters of at least one element required to secure Plaintiffs' right to a name-clearing hearing were not clearly established at the time of the Releases. *See Hunter v. Bryant,* 502 U.S. 224, 226 (1991) (per curiam) (noting if the parameters of the right are not clearly established by case law, the official is entitled to qualified immunity).

C

Even were we to assume, *arguendo*, that it was clearly established that the allegedly stigmatizing statements in the Releases met the "temporal nexus" requirement of *Campanelli*, it was not clearly established at the time the Releases were issued whether the Governor had the ability to alter Plaintiffs' legal rights or status sufficiently to meet the requirements for a Fourteenth Amendment due process violation.

[9] The Governor contends that even if the statements could qualify as stigmatizing, the facts show that he did not terminate Plaintiffs' employment or otherwise alter Plaintiffs' legal rights or status; he claims that those actions were taken by SAIF. As authority for his position, the Governor suggests we adopt the reasoning of the First Circuit in *Hawkins v. Rhode Island Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir. 2001). In *Hawkins*, the plaintiff, the former director of the Rhode Island Lottery Commission, contended that the governor of Rhode Island had made defamatory statements about him and had worked to accomplish his termination through his "surrogates" on the Commission. *Id.* at 115. The governor of Rhode Island had "publicly claimed a significant role in ousting [plaintiff]." *Id.* at 116. The court held that the governor of Rhode Island did not impose a "plus" on the plaintiff because, under Rhode Island law, the governor lacked the authority to terminate the plaintiff's employment. *Id.*

[10] The same is technically true here, as Governor Kulongoski's statutory authority over SAIF is limited to appointing

Board members (subject to senate confirmation) and to removing Board members. Or. Rev. Stat. § 656.751(1) & (3). The relevant statutes give the governor no role in SAIF employment decisions. *Id.*

Plaintiffs argue that, although the Governor did not have the authority to officially make employment decisions at SAIF, Governor Kulongoski personally ordered the removal of Tibbetts and the appointment of Rocklin as the new SAIF manager. According to SAIF Board members, Governor Kulongoski threatened their removal if they did not make the employment decisions he wanted. Plaintiffs argue that they are entitled to the reasonable inference that the terminations were made at the instruction, and under the control, of the Governor.

**[11]** This circuit has shown considerable flexibility when evaluating the cause of a deprivation of constitutional rights. For example, in *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978), we explained:

> Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

This statement has been adopted in the context of the Fourteenth Amendment right to a name-clearing hearing. *See Gini,* 40 F.3d at 1044. Here, however, although perhaps Governor Kulongoski "reasonably should [have] know[n]" that his actions set in motion a series of acts that would cause Plaintiffs' terminations, there is no evidence in the record that shows that the Governor was aware——or should have been aware——that, were the Plaintiffs to be terminated, that they

would not receive name-clearing hearings. *Johnson*, 588 F.2d at 740. Thus, although this circuit has shown flexibility in evaluating causation in this context, there is no case law that clearly establishes the Governor should have been aware that his actions would deprive Plaintiffs of their rights.

**[12]** Because we are addressing the "clearly established rights" prong of *Saucier*, as permitted by *Pearson,* we hold that the Governor's ability to "cause" Plaintiffs' terminations in a Fourteenth Amendment liberty interest context was not clearly established in this circuit at the time of the Releases. Accordingly, for this additional reason, we hold that the parameters of Plaintiffs' rights as alleged were not clearly established at the time of the alleged violation and that Governor Kulongoski should be granted qualified immunity.

## CONCLUSION

Although cases need not be "fundamentally similar" in order to put an official on notice that his conduct violates established law, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), if the parameters of the right are not clearly established by case law, the official is entitled to qualified immunity. *See Hunter,* 502 U.S. at 229 (qualified immunity affords government officials the benefit of the doubt in close calls, since "officials should not err always on the side of caution" because they fear being sued); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 244 (3d Cir. 2006) (holding that government officials should have been granted qualified immunity even when the court determined that they had violated the plaintiff's constitutional right to a name-clearing hearing, as the law was not sufficiently clear on the parameters of the right at the time).

Here, it cannot be said that a reasonable person in Governor Kulongoski's position would have known that he was violating Plaintiffs' Fourteenth Amendment due process rights under the circumstances of this case. Even if we assume, *arguendo* that the statements in the Releases were stigmatiz-

ing to Plaintiffs, it was not then established whether the stig-
matizing statements satisfied the "temporal nexus"
requirement of *Campanelli*, nor that the Governor could be
found to have "caused" Plaintiffs' terminations. Accordingly,
we reverse the district court's denial of summary judgment to
Governor Kulongoski.

**REVERSED** and **REMANDED** with instructions to enter
judgment in favor of Governor Kulongoski.