**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RONALD H. KRAMER,
*Plaintiff-Appellee*,

v.

MARY CULLINAN,
*Defendant-Appellant*,

and

SOUTHERN OREGON
UNIVERSITY; OREGON
UNIVERSITY SYSTEM; GEORGE
PERNSTEINER,
*Defendants*.

No. 14-36103

D.C. No.
1:13-cv-00340-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted June 7, 2017
Portland, Oregon

Filed January 3, 2018

Before:  A. Wallace Tashima, Ronald M. Gould,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's order, on summary judgment, denying qualified immunity to Dr. Mary Cullinan, the former-President of Southern Oregon University, in an action filed by Ronald Kramer alleging that Dr. Cullinan violated his liberty interest by releasing stigmatizing information in connection with his termination.

The panel held that Dr. Cullinan was entitled to qualified immunity. The panel held that a letter drafted by counsel concerning Kramer's employment, which became publicly available, did not contain stigmatizing content. The panel held that the letter stopped short of actually imputing to Kramer any bad faith, willful misconduct, intentional acts, waste or fraud, and the letter did not reference the type of stigmatizing statements that this Circuit has held to be actionable, *i.e.*, those accusing terminated employees of dishonesty, immorality and the like. Viewing this evidence in the light most favorable to Kramer, the panel concluded that the district court's characterization of the letter's contents as stigmatizing was erroneous, and that Dr. Cullinan was entitled to qualified immunity. The panel further held that even if the content were stigmatizing, it was not clearly established law that charges other than fraud, dishonesty, and immorality would trigger the requirements of a name-clearing hearing. The panel therefore reversed the district court's decision denying qualified immunity and remanded with

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

directions to enter summary judgment in favor of Dr. Cullinan.

## COUNSEL

Brenda K. Baumgart (argued), Amy Joseph Pedersen, Andrea H. Thompson, and Rachel C. Lee, Stoel Rives LLP, Portland, Oregon, for Defendant-Appellant.

Christine N. Moore (argued) and Richard S. Yugler, Landye Bennett Blumstein LLP, Portland, Oregon, for Plaintiff-Appellee.

## OPINION

RAWLINSON, Circuit Judge:

Dr. Mary Cullinan (Dr. Cullinan), former-President of Southern Oregon University (SOU), appeals from the district court's denial of her motion for summary judgment seeking qualified immunity in an action filed by Ronald Kramer (Kramer) alleging that Dr. Cullinan violated his liberty interest by releasing stigmatizing information in connection with his termination. Because it is unlikely that the information released was stigmatizing, and because it was not clearly established as a matter of law that the information was stigmatizing, Dr. Cullinan was entitled to qualified immunity.

## I. *BACKGROUND*

SOU employed Kramer on an annual appointment basis in a dual role, as Executive Director of Jefferson Public Radio

(Public Radio) and as Executive Director of a related foundation, the JPR Foundation, Inc. (Foundation). Kramer reported directly to Dr. Cullinan.

At some point, Dr. Cullinan became concerned about costly capital projects being undertaken by Foundation, such as the acquisition and renovation of a theater and a warehouse. Dr. Cullinan notified Foundation and the Oregon University System (University System) Chancellor (Chancellor Pernsteiner), of the potential financial risk to SOU as a result of Foundation's projects. Dr. Cullinan also raised the issue of conflict-of-interest situations between Public Radio and Foundation.

In response to Dr. Cullinan's concerns, Chancellor Pernsteiner initiated an asset and liability review of Public Radio and Foundation. The resulting report (Audit Report) concluded that Foundation's new projects could impose "additional strain" on community fund-raising and "may not align with policy interests of SOU." The Audit Report also noted inherent problems, including actual, apparent, and potential conflicts of interest with Kramer serving as Executive Director of both Public Radio and Foundation. One consequence of that arrangement was "a lack of segregation of duties by the Executive Director of [Public Radio] when entering into contracts," which was a conflict of interest because "one individual cannot adequately represent the interests of two separate parties to the same agreement or contract." The Audit Report determined that this situation was contrary to SOU's contract policy.[1]

---

[1]     Additionally, Oregon Administrative Rule 580-046-0025(2) provided that a foundation's governing body, employees, and agents "[s]hall not be subject to control by the institution or an institution

The Audit Report concluded that there was high internal control risk regarding the key areas examined. The report included recommendations to reduce those risks, including prohibiting one person from serving as Executive Director of both Public Radio and Foundation. In response, Dr. Cullinan agreed to address the concerns raised by the Audit Report and eliminate the conflict of interest posed by Kramer's dual roles. Dr. Cullinan convened a task force to address implementation of the recommendations in the Audit Report.

Kramer resisted limiting his employment to one role, and insisted that it was crucial to Public Radio and Foundation that he continue serving as Executive Director of both entities. The task force completed its work, but no recommended resolution of the conflict presented by Kramer's dual roles was presented to Dr. Cullinan.

In the meantime, Kramer launched a counteroffensive, drafting and distributing proposed resolutions to the Foundation Board (Board). The resolutions would have dramatically altered the relationship between SOU and Foundation, deprived SOU of assets, and secured Kramer's position at Foundation. The resolutions were to be voted upon at the Board meeting scheduled for March 22, 2012.

Upon learning of Kramer's proposed resolutions, Dr. Cullinan sought the advice of counsel, who sent a letter (Miller Nash Letter) to Foundation's attorney, dated the same day as the scheduled board meeting. The Miller Nash Letter included a copy of the Audit Report and highlighted the recommendation that SOU eliminate the conflict of interest

---

employee" and "[s]hall not give the appearance that the institution or any of its officers or employees control the foundation or its property."

presented by Kramer's dual role. The Miller Nash Letter informed Foundation that SOU considered Kramer's proposed resolutions counterproductive, and requested that Foundation's Board not adopt the proposed resolutions. The Letter also outlined potential avenues of legal redress against Foundation, its Board, and/or Kramer, to protect SOU's rights in Public Radio and its assets.

The Miller Nash Letter also addressed the directors' and Kramer's potential liability, outlining reasons why they might not be protected by directors' and officers' liability insurance. It is this portion of the Miller Nash Letter that precipitated Kramer's claim of stigmatization. In the course of explaining why indemnification might not be available to Kramer or Foundation's directors, the Miller Nash Letter opined that directors' and officers' liability policies generally "exclude coverage for intentional acts, waste, or fraud." The Miller Nash Letter contained the following language that Kramer also identified as stigmatizing:

> Nor do we see a clear path to indemnity. Article X of the bylaws forbids indemnification for actions taken in bad faith or through willful misconduct. If any actions of Mr. Kramer or the Foundation's directors (including past actions and the adoption of the Proposed Resolutions) are determined to have been made in bad faith or through willful misconduct, neither Mr. Kramer nor the Foundation's directors will be entitled to indemnification, and they are unlikely to be entitled to protection under any directors' and officers' liability insurance.

The Miller Nash Letter also contained a request that Foundation's attorney transmit the Letter to Board members.

At the Board meeting, copies of the Miller Nash Letter were made available. Members of the press were in attendance. In a prepared statement to the Board, Dr. Cullinan discussed SOU's need to act as a "good steward of public assets," and expressed her hope for a mutually beneficial outcome. She stated in part:

> While I continue to hope for a mutually beneficial solution, I must be clear that, if the board passes some of the resolutions before it today, SOU must take prompt action to protect the interests of [Public Radio], its donors and the University. As you know, SOU is a public university and has a legal obligation to be a good steward of public assets. In light of that obligation, we have consulted external legal counsel about the possible consequences of the actions before the [Public Radio Foundation] board, and we will follow the advice of counsel in taking whatever action is warranted should these resolutions pass. Our attorneys have drafted a letter outlining the serious potential risks associated with the proposed resolutions, and they have asked the [Public Radio] Foundation's attorney to share that letter with you all.

Dr. Cullinan urged SOU and Foundation to address their issues through mediation, rather than legal action. Still, she expressed a belief that if the resolutions were passed, "and

SOU is required to take protective legal action, this situation will quickly move past the point where we can reach an amicable resolution."

After the Board rejected the proposed resolutions, Foundation and SOU engaged in mediation resulting in an agreement that was not approved by the Board.

The day following the Board meeting, Dr. Cullinan sent Kramer a potential non-renewal notice (the March 23 Notice). The March 23 Notice informed Kramer that his annual appointment with SOU "may not be renewed for the upcoming 2012-2013 fiscal year" and that his employment with SOU "may terminate on June 30, 2012."

On June 25, 2012, Dr. Cullinan informed Kramer that his appointment definitely would not be renewed (the June 25 Non-Renewal). The non-renewal was without cause. Kramer challenged the non-renewal of his appointment and received a hearing before SOU's Grievance Hearing Committee (the Committee). Due to the equivocal phrasing of the March 23 Notice, the Committee determined that Kramer had not "received proper notice of his non-renewal." The Committee recommended that Kramer be given 90 days' salary and benefits to remedy the insufficient notice, which Dr. Cullinan approved and SOU paid. The Committee also confirmed that SOU policy did not require any reason to be stated in a notice of non-renewal.

Following completion of the grievance procedures, Kramer brought suit in federal district court against Dr. Cullinan, Chancellor Pernsteiner, SOU, and the University System (collectively the Defendants), asserting various claims related to his separation, including a civil rights claim

against Dr. Cullinan for deprivation of a liberty interest without due process of law.[2] Defendants moved for summary judgment on all claims, including the state law claims, against Dr. Cullinan and Chancellor Pernsteiner. In a well-reasoned order, the district court granted summary judgment in favor of Defendants on all claims, with the exception of the civil rights claim against Dr. Cullinan for deprivation of a liberty interest without due process of law.[3]

Addressing Kramer's liberty interest claim against Dr. Cullinan, the district court concluded that the Miller Nash Letter contained stigmatizing charges against Kramer, that the charges were made public, and that the charges were connected to Kramer's termination. The district court also held that Kramer's constitutional right was clearly established. This claim against Dr. Cullinan is the only issue remaining for resolution on appeal.

---

[2] Kramer also alleged violation of his property interest without due process (against Dr. Cullinan), violation of equal protection under the Fourteenth Amendment (against Chancellor Pernsteiner), and state law claims of blacklisting (against SOU and Dr. Cullinan), tortious interference with economic relations, breach of contract, and wage and hour violation.

[3] The court concluded that Kramer "had no protected property interest in his continued employment with SOU," that "Pernsteiner's actions did not constitute a violation of Kramer's right to equal protection," that there was "no evidence . . . that Defendants acted with the malicious intent to injure Kramer" through blacklisting, that Kramer was not entitled to any further remedy under his contract because he "received ninety days of pay and benefits," and that the Grievance Committee's award was not subject to Oregon's wage collection statute.

## II. *DISCUSSION*

Dr. Cullianan contends that she is entitled to qualified immunity with respect to the claim that she "[v]iolated [n]o Fourteenth Amendment [r]ight." Specifically, Dr. Cullinan maintains that the Miller Nash Letter contained no stigmatizing charges, that the Letter was not sent in the course of Kramer's termination, and that the asserted constitutional right was not clearly established at the time of the alleged violation.

"We review a denial of qualified immunity de novo, viewing the facts and drawing reasonable inferences in the light most favorable to the party opposing summary judgment. . . . " *Ames v. King Cty., Wash.*, 846 F.3d 340, 347 (9th Cir. 2017) (citation omitted).

To determine whether a public official is entitled to qualified immunity, we consider whether 1) the official violated a constitutional right, and 2) the "right was clearly established at the time of the official's alleged misconduct." *Id.* (citation omitted). It is within our discretion which prong to address first. *See id.*

### A) Whether Dr. Cullinan violated a constitutional right

The Fourteenth Amendment protects against deprivation of liberty and property interests without due process of law. *See K.W. ex rel. D.W v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015). "A person's liberty interest is implicated if the government levels a charge against him that impairs his reputation for honesty or morality. . . . " *Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009), *as amended* (citation and internal quotation marks omitted). If the government, in the

course of terminating a person's employment, publicly discloses stigmatizing information, the employee is entitled to a "name-clearing hearing." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004).

To establish that she "has a protected liberty interest at stake," a plaintiff must demonstrate that: "(1) the accuracy of the charge is contested, (2) there [was] some public disclosure of the charge, and (3) the charge [was] made in connection with the termination of employment . . ." *See Guzman*, 552 F.3d at 955 (citation and internal quotation marks omitted).[4]

Whether a defendant's statements rise to the level of stigmatizing a plaintiff is a question of fact. *See Campanelli v. Bockrath*, 100 F.3d 1476, 1480 (9th Cir. 1996). We have previously held that charges made by an employer may be sufficiently stigmatizing to implicate an employee's liberty interest. *See, e.g.*, *Guzman*, 552 F.3d at 946 (accusing employee of fraudulently avowing that medical devices were FDA-approved); *Campanelli*, 100 F.3d at 1480 (charging coach with "immoral conduct"); *Vanelli v. Reynolds Sch. Dist.*, 667 F.2d 773, 776–78 (9th Cir. 1982) (dismissing teacher for "offensive conduct").

Here, the Miller Nash Letter explained that if Kramer's proposed resolutions were approved by Foundation, SOU might pursue legal redress. The Miller Nash Letter specifically mentioned potential legal action against Kramer individually for breach of fiduciary duty and violations of the

---

[4] We assume, without deciding, that the Miller Nash Letter was sent in the course of Kramer's termination. It is undisputed that the other requirements are met.

Standards of Conduct for officers of Oregon nonprofit corporations. The Letter also expressed that in the event the resolutions were passed, SOU did not "see a clear path toward indemnity." As discussed, it was in this context that the language identified by Kramer as stigmatizing was used—identifying "actions taken in bad faith or through willful misconduct" and noting that "intentional acts, waste or fraud" are generally excluded from coverage.  The difficulty with Kramer's argument is that the Letter stopped far short of actually imputing bad faith, willful misconduct, intentional acts, waste, or fraud to Kramer. Rather, the Letter stated that *if* the actions were later determined to constitute bad faith or willful misconduct, insurance coverage would not be available. This statement is not analogous to the affirmative statements we have held to be stigmatizing.  *See, e.g.*, *Guzman*, 552 F.3d at 946; *Campanelli*, 100 F.3d at 1480; *Vanelli*, 667 F.2d at 776–78.

In *Tibbets v. Kulongoski*, 567 F.3d 529, 530 (9th Cir. 2009), former employees brought a § 1983 action against the Governor of Oregon and other state actors alleging violation of their Fourteenth Amendment due process rights. The employees maintained that the state made stigmatizing statements about them in press releases without providing name-clearing hearings. *See id.* We reiterated that "a liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Id.* at 535 (citation omitted). We concluded that statements referencing "strengthening accountability and transparency," "ethics," "honesty," and "openness" were "more analogous to cases where honesty . . . has been implicated." *Id.* at 537 (alteration omitted).

In *Cox*, a terminated employee brought a § 1983 action alleging in part that county officials deprived him of his liberty interest in his good name. We focused our analysis on whether placing a stigmatizing termination letter in an employee's personnel file sufficiently publicized the stigmatizing information. *See* 359 F.3d at 1109–12. We accepted as true Cox's assertion that the notice of termination in his personnel file contained stigmatizing information, explaining that "there is no doubt that the termination letter charged improper conduct and could impair Cox's reputation for honesty or morality." *Id.* at 1113.

The Miller Nash Letter stopped short of actually imputing to Kramer any bad faith, willful misconduct, intentional acts, waste or fraud, and the Letter did not reference the type of stigmatizing statements we have held to be actionable, *i.e.*, those accusing terminated employees of dishonesty, immorality and the like. Viewing this evidence in the light most favorable to Kramer, we conclude that the district court's characterization of the Letter's contents as stigmatizing was erroneous, and Dr. Cullinan was entitled to qualified immunity.

## B) Whether the asserted right was clearly established

Although we elected to first address the existence of a constitutional violation, we would reach the same result had we first examined whether the constitutional right asserted is clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").

For a constitutional right to be "clearly established" its "contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Richard*, 134 S. Ct. 2012, 2023 (2014). Although a case "directly on point" is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation and internal quotation marks omitted). So long as existing caselaw "did not preclude" an official from reasonably believing that his or her conduct was lawful, the official has a right to qualified immunity. *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014).

To evaluate whether a particular question is beyond debate, a court looks for "cases of controlling authority in [the plaintiff's] jurisdiction at the time" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). The plaintiff bears the burden of demonstrating that the right at issue was clearly established. *See Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011).

By the time of Kramer's termination, it was clearly established law that an employer charging an employee with fraud, dishonesty, or immorality is required under the Fourteenth Amendment to afford that employee a name-clearing hearing. *See Guzman*, 552 F.3d at 955; *Tibbetts*, 567 F.3d at 530; *Campanelli*, 100 F.3d at 1480. However, that generalized statement of the law was not sufficient to put Dr. Cullinan on notice that her particular actions violated Kramer's constitutional rights. *See Mitchell v. Washington*, 818 F.3d 436, 447 (9th Cir. 2016) (holding that it is not

enough "that the broad principle underlying a right is well-established") (citation and alteration omitted). Accordingly, Kramer's reliance on *Tibbets* and *Cox* as "clearly establishing" precedent is not persuasive. Those cases did not definitively place the question of whether the conditional language in the Miller Nash letter was stigmatizing "beyond debate." *Plumhoff*, 134 S. Ct. at 2023. Indeed, as discussed, the language in the Letter is not similar to phrasing that we have found to be stigmatizing.

The district court failed to identify, the parties have not cited, and we have not found a case where conditional language was determined to be stigmatizing. Neither has a case been referenced that found stigmatization in the absence of a charge of fraud, dishonesty, or immoral conduct. In this circumstance, Kramer has failed to place the stigmatizing nature of the Letter "beyond debate." *White*, 137 S. Ct. at 551; *see also Alston*, 663 F.3d at 1098 (placing this burden on the plaintiff). Reliance on the broad principles espoused in *Tibbets* and similar cases clearly establishing the stigmatizing nature of charges of fraud, dishonesty, or immorality does not place the question in this case "beyond debate" because the Letter did not charge Kramer with fraud, dishonesty or immorality. At worst, the Letter could plausibly be read to imply a breach of fiduciary duty. But no precedent has been brought to our attention clearly establishing a charge of breach of fiduciary duty as stigmatizing.

The Supreme Court has cautioned us against defining clearly established law "at a high level of generality." *White*, 137 S. Ct. at 552. In *White*, the Supreme Court overruled a decision of the Tenth Circuit denying qualified immunity where "it failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the

Fourth Amendment." *Id.* at 550, 552. The Supreme Court reiterated that "the clearly established law must be particularized to the facts of the case." *Id.* at 552 (citation and internal quotation marks omitted). There is simply no clearly established law "particularized to the [unique] facts of [this] case." *Id.* This is not a case where the stigmatizing nature of the charge is obvious as in *Guzman*, 552 F.3d at 946 (fraud), or *Tibbets*, 567 F.3d at 530 (dishonesty), or *Campanelli*, 100 F.3d at 1480 (immorality), or *Vanelli*, 667 F.2d at 776–78 ("offensive conduct"). Dr. Cullinan's conduct did not constitute such a run-of-the-mill Fourteenth Amendment violation. Instead, this case lacks an explicit charge of fraud, dishonesty, or immorality, militating against a conclusion that Dr. Cullinan's actions violated a "clearly established" right. *White*, 137 S. Ct at 552.

## III. *CONCLUSION*

Dr. Cullinan was entitled to qualified immunity. The Miller Nash Letter did not contain stigmatizing content, and even if the content were stigmatizing, it was not clearly established law that charges other than fraud, dishonesty, and immorality would trigger the requirements of a name-clearing hearing. The district court decision denying qualified immunity to Dr. Cullinan is reversed, and the case is remanded to the district court with directions to enter summary judgment in favor of Dr. Cullinan.

**REVERSED and REMANDED with directions.**