**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TONJA AMES,
                    *Plaintiff-Appellee*,

v.

KING COUNTY, Washington,
                    *Defendant*,

and

HEATHER R. VOLPE, member of
the King County Sheriff's
Department; CHRISTOPHER
SAWTELLE, member of the King
County Sheriff's Department;
DANIEL L. CHRISTIAN, member
of the King County Sheriff's
Department,
            *Defendants-Appellants*.

No. 14-36035

D.C. No.
2:13-cv-01030-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, Chief Judge, Presiding

Argued and Submitted December 7, 2016
Seattle, Washington

Filed January 13, 2017

Before: M. Margaret McKeown, Richard C. Tallman,
and Morgan B. Christen, Circuit Judges.

Opinion by Judge Tallman

**SUMMARY**\*

**Civil Rights**

The panel reversed the district court's denial, on summary
judgment, of qualified immunity to King County Sheriff's
Deputies in a 42 U.S.C. § 1983 action in which plaintiff
alleged, among other things, that deputies violated her Fourth
Amendment rights by using excessive force during an arrest
and unlawfully searching her truck.

The panel held that the deputies were entitled to qualified
immunity because their actions were objectively reasonable
in light of the urgent need to deliver life-saving care to an
overdose victim, and to ensure the safety of everyone at the
scene.

**COUNSEL**

David J. Hackett (argued), Senior Deputy Prosecuting
Attorney; Daniel T. Satterberg, Prosecuting Attorney; King

---

\* This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

County Prosecuting Attorney's Office, Seattle, Washington; for Defendants-Appellants.

Darryl Parker (argued), Civil Rights Justice Center PLLC, Seattle, Washington, for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

This interlocutory appeal requires us to address the reasonableness of actions taken by King County Sheriff's Deputies functioning in their community caretaking capacities during a life-and-death medical emergency. We reverse the district court's denial of qualified immunity on Appellee's excessive force and unlawful search claims because we conclude the deputies' actions were objectively reasonable in light of the urgent need to deliver life-saving care to an overdose victim, and to ensure the safety of everyone at the scene.

**I**

The events leading up to the use of force and search at issue in this case are largely undisputed.[1]  On February 6, 2013, at 6:30 p.m., Tonja Ames called 911 to summon an ambulance for her 22-year-old son, Colin Briganti. Briganti lived in a converted garage apartment attached to his mother's home and suffered from heart and lung problems as

---

[1] Where the details are disputed, we rely on Ames's account as the non-moving party for purposes of our review. *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010).

a result of prior drug abuse. Upon arriving home from work that day, Ames found Briganti in his bedroom "slumped over on the couch drooling" and incoherent. She also found what appeared to be a suicide note and feared Briganti may have overdosed on one of his medications. Ames called her neighbors, William and Linda Eby, who came over to help.

The 911 operator classified the call as a Priority 1 suicide attempt and dispatched a firefighter/EMT aid crew and a police officer to Ames's residence. According to the County, it is common practice for police officers to respond to attempted suicide calls in order to secure the scene and ensure the safety of the aid crew. King County Sheriff's Deputy Heather Volpe, who is an expert instructor in drug recognition, arrived at Ames's house within approximately four minutes of Ames's 911 call, pulling up at virtually the same time as an aid car from Woodinville Fire and Rescue. The aid car was manned by Lieutenant Drago Nevistic and Firefighter/EMTs Chris Mezzone and Larry Laurent. Ames met Deputy Volpe and the aid crew in her driveway by the front right corner of the house and told them about Briganti's medical history, his current condition, and the suicide note. Ames then directed Deputy Volpe and the aid crew around to the garage apartment entrance at the back of the house. Firefighter/EMTs Mezzone and Laurent were in the lead and entered the apartment, with Ames, Deputy Volpe, and Lieutenant Nevistic following behind.

As Ames, Deputy Volpe, and Lieutenant Nevistic arrived at the doorway, Ames refused entry to Deputy Volpe. Ames told Deputy Volpe that only the aid crew could enter the apartment. According to Ames, Deputy Volpe replied, "If I can't enter the home, then you get no service," and directed the aid crew to exit the apartment. Firefighter/EMTs

Mezzone and Laurent withdrew from the apartment; they had not yet engaged with Briganti but Laurent had observed that he was sitting in a chair, "semi-conscious" and "lethargic," and that he "barely could keep his eyes open."

Neither Deputy Volpe nor any member of the aid crew had ever encountered a situation where the person who called 911 would not allow police to enter with the emergency medical personnel responding to the call. Because Ames's refusal was unusual, and because the call involved a possible suicide attempt, Deputy Volpe became concerned for the safety of the responders on the scene and what might have happened inside the apartment. Together, Deputy Volpe and the aid crew retreated to their vehicles parked at the curb. Deputy Volpe radioed to inform dispatch and her patrol supervisor, Sergeant Kevin Johannes, that Ames was refusing to let police enter and the aid crew was refusing to work on Briganti inside the apartment. Deputy Volpe requested backup and waited, further advising dispatch that Briganti had overdosed on pills and was semi-conscious and very lethargic. Deputy Volpe had specialized training as a Drug Recognition Expert Instructor with knowledge of various medications and their effects. She was concerned that Briganti would die. Ames had listed Briganti's medications for Deputy Volpe when the aid crew first arrived, and Deputy Volpe recognized most of them as Central Nervous System depressants.

Before leaving Briganti's apartment, the aid crew did not tell Ames that they could treat her son outside the apartment or that they would wait outside for him. When the first responders withdrew, Ames and her neighbors had remained in Briganti's apartment. Ames panicked—thinking the aid crew was going to leave—and enlisted her neighbors to help

her carry Briganti outside and load him into her pickup truck parked in the driveway so she could drive him to the nearest hospital. Deputy Volpe watched as Ames and her neighbors carried Briganti, apparently unconscious, out from behind the house. She assumed Ames would now let the aid crew work on Briganti in the driveway but, once she observed their efforts to load Briganti into Ames's truck, Deputy Volpe radioed her patrol supervisor: "Looks like they're trying to load him up into a truck and leave. . . . Should I stop them[?]" Sergeant Johannes replied: "Yeah, if you have aid there they need to work on him. So, yeah." Deputy Volpe then moved her patrol car to block the truck's exit from the driveway and approached Ames as she was climbing into the driver's side of the truck cab. Ames's neighbors had finished buckling Briganti into the passenger seat, where he remained slumped over and unresponsive during the events that followed.

Deputy Volpe yelled at Ames as she approached the truck, telling Ames that she needed to let the EMTs take Briganti and that it was unlawful for Ames to leave with him. When Deputy Volpe refused to move her patrol car, Ames became angry, pointed her finger at Deputy Volpe, and yelled: "Move your f-ing vehicle. I'm taking my son to the hospital. You guys left. You won't help him. Get out of my way." She continued climbing into the driver's seat, then placed the suicide note she had retrieved from the apartment in between the truck seats and put the keys in the ignition while reaching out with her left arm to close the driver's-side door. Simultaneously, Deputy Volpe reached the driver's side of the truck and used her body to block the door from closing. She then attempted to pull Ames from the truck cab. Ames grabbed the steering wheel tightly with her right hand and Deputy Volpe employed a hair hold to distract Ames and loosen her grip so the officer could remove Ames from the

truck. Deputy Volpe took Ames down to the ground into a prone handcuffing position. According to the County's police practices expert, a hair hold is a low-level distraction and minor pain compliance technique that is at the lower end of takedown options in relative level of force. Essentially, Deputy Volpe grasped Ames's hair close to her scalp, causing Ames to release the steering wheel and reach up towards her scalp, whereupon Deputy Volpe was able to pull Ames out of the cab of the truck and down to the ground.

Ames landed on the ground with her right arm pinned under her body. Deputy Volpe held onto Ames's hair with one hand and pushed her knee into Ames's back while she handcuffed Ames's left arm. She ordered Ames to provide her right arm for cuffing and, according to Ames, slammed Ames's head into the ground three times as Ames tried to explain that her arm was pinned and that she suffered from a back injury. Deputy Volpe was then able to pull Ames's right arm behind her back, handcuff her, and radio that she had her pinned on the ground. In all, 97 seconds elapsed between Sergeant Johannes's instruction that Deputy Volpe keep Ames from leaving the scene and Deputy Volpe's report that she had Ames subdued on the ground. The first backup unit did not arrive on the scene until a little under a minute after Deputy Volpe had subdued Ames.

The aid crew rushed to assist Briganti as soon as Deputy Volpe removed Ames from the truck. They first moved Briganti from the truck into the aid car and then drove approximately 100 yards down the street for initial assessment because they were concerned about the potential for further confrontations. Based on their assessment of the severity of Briganti's condition and the shallowness of his breathing, the aid crew called for a nearby advanced life

support medic unit to transport Briganti to the hospital in case airway support was required en route to keep him alive.

Deputy Christopher Sawtelle, the first backup officer to reach the scene, arrived shortly after the aid crew had begun to treat Briganti. Deputy Sawtelle observed Ames handcuffed on the ground near the open driver's-side door of the truck. He got out of his vehicle and approached Deputy Volpe to ask whether she needed assistance securing the scene. Deputy Volpe moved Ames to the back seat of her patrol car. Deputy Sawtelle did not speak with the aid crew treating Briganti, but understood from Deputy Volpe's radio transmissions and information he received on the scene that Briganti had been in the truck and that the suicide note was in the truck. As a result, Deputy Sawtelle believed the truck was a possible overdose scene and he searched the cab, glove compartment, and truck bed, assisted by Deputy Daniel Christian. Deputy Sawtelle found a loaded gun in the glove compartment (legally registered to Ames) as well as bottles of prescription drugs, at least one of which was prescribed to Briganti. He also retrieved the suicide note. Deputy Sawtelle did not specifically recall communicating the note and the medications he found to the medical personnel on the scene, but swears it would have been his standard practice to communicate any relevant information to the treating EMTs and paramedics, including the nature of medications or relevant portions of a suicide note.

Briganti was transported in the advanced life support unit to the emergency room at Evergreen Hospital Medical Center, located some distance away. Ames was released from her handcuffs and gave a statement to Sergeant Johannes, who had by then arrived at the scene. A photograph of Ames taken by Sergeant Johannes at the time

of her statement shows abrasions on Ames's right palm. Ames reported to Sergeant Johannes that she was experiencing pain in her right palm, her wrist, her right knee, and her rib cage.[2] Ames then followed Briganti to the hospital to have her injuries checked. Briganti survived his overdose and no charges were filed against Ames or Briganti.

## II

Ames brought a number of claims against King County and Deputies Volpe, Sawtelle, and Christian under 42 U.S.C. § 1983. Ames alleged that Deputy Volpe violated her Fourth Amendment rights by arresting her without probable cause, conducting an unreasonable seizure, using excessive force during the arrest, and conducting an unlawful search of her truck.[3] Ames asserted that Deputy Volpe violated her First Amendment rights by retaliating against her after she refused entry to Deputy Volpe. Finally, Ames alleged that King County acted with deliberate indifference to her rights by failing to adequately train its deputies, and brought pendant state law claims of assault, battery, false arrest, and false imprisonment against Deputy Volpe and King County (under a *respondeat superior* theory).

On summary judgment, the district court granted qualified immunity to Deputy Volpe on all but the excessive force claim (and the related state law assault and battery claims),

---

[2] During her subsequent deposition, Ames described her injuries as: "My head, my right wrist, my palms were bleeding, my right knee, . . . [m]y left side of my ribcage, all the way over into my back. My neck."

[3] Deputies Sawtelle and Christian also were named in the unlawful search claim.

denied qualified immunity to Deputies Sawtelle and Christian
on the unlawful search claim, and dismissed the deliberate
indifference claim against King County.**[4]**  Specifically, the
district court ruled that it could not resolve as a matter of law
whether the amount of force used during Ames's arrest and
the scope of the search of her truck were reasonable.  The
court also dismissed the state law false arrest and false
imprisonment claims against Deputy Volpe and the remaining
state law claims against King County.

Deputies Volpe, Sawtelle, and Christian timely appealed
the district court's denial of qualified immunity on the
excessive force and unlawful search claims.  The district
court stayed the case pending resolution of the deputies'
appeal now before us.  We have jurisdiction under 28 U.S.C.
§ 1291.  We reverse.

## III

We review a denial of qualified immunity de novo,
viewing the facts and drawing reasonable inferences in the
light most favorable to the party opposing summary
judgment. *Wilkinson*, 610 F.3d at 550 (citing *Scott v. Harris*,
550 U.S. 372, 378 (2007)).  Where the district court has
determined the parties' evidence presents genuine issues of
material fact, such determinations are not reviewable on
interlocutory appeal. *See Lee v. Gregory*, 363 F.3d 931, 932
(9th Cir. 2004).  However, we may adjudicate "legal"
interlocutory appeals; that is, we may properly review a
denial of qualified immunity where a defendant argues—as
the deputies argue here—that the facts, even when considered
in the light most favorable to the plaintiff, show no violation

---

**[4]** Ames did not oppose the dismissal of this claim.

of a constitutional right, or no violation of a right that is clearly established in law. *See A.K.H. v. City of Tustin*, 837 F.3d 1005, 1010 (9th Cir. 2016) ("A defendant who appeals a denial of qualified immunity on the ground that his conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law has raised legal issues that may be properly heard in an interlocutory appeal." (internal quotation marks and alterations omitted) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014))).

## IV

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We may exercise discretion in deciding which of the two prongs to address first. *Id.*

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "We do not require a case to be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The "clearly established" inquiry, however, "'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" and factual specificity is "especially important in the Fourth Amendment context." *Id.* (quoting *Brosseau v.*

*Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quoting *Ashcroft*, 563 U.S. at 743).

With these principles in mind, we review whether Deputies Volpe, Sawtelle, and Christian are entitled to qualified immunity in this case. We conclude that they are.

## A

Use of force is a seizure that is subject to the Fourth Amendment's reasonableness requirement. *Wilkinson*, 610 F.3d at 550. Under the Fourth Amendment, officers may use only such force as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Accordingly, we must determine, in light of the particular facts and circumstances Deputy Volpe faced at the scene of Briganti's apparent suicide attempt, whether the actions she took in subduing Ames were objectively reasonable. *See Scott*, 550 U.S. at 381. We make this determination "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Additionally, we recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (internal quotation marks and citation omitted).

In order to determine whether a use of force was objectively reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing government interests at stake." *Id.*; *see also Scott*, 550 U.S. at 383. Proper application of the test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The second of these so-called *Graham* factors—whether there is an immediate threat to the safety of the arresting officer or others—is the most important. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).

For purposes of our analysis, we accept Ames's description of Deputy Volpe's use of force. *Wilkinson*, 610 F.3d at 550. Accordingly, we must determine whether, in preventing Ames from obstructing efforts to save Briganti, it was objectively reasonable for Deputy Volpe to execute three head slams and use her knee to pin Ames to the ground. Applying the *Graham* factors to the particular facts and circumstances of this case, we conclude that Deputy Volpe's use of force was objectively reasonable.

The government interest in subduing Ames here was substantial. The first *Graham* factor speaks of the "severity of the crime at issue," but we think the district court applied this factor too narrowly when it focused on Ames's misdemeanor obstruction of Deputy Volpe rather than the nature of the ongoing emergency exacerbated by Ames's resistance. Deputy Volpe was acting in her community caretaking capacity, "totally divorced from the detection,

investigation, or acquisition of evidence relating to the violation of a criminal statute," when she responded to the 911 call for help. *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *see also United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) (explaining that the "emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers"). Thus, we believe the better analytical approach here under the first *Graham* factor should be to focus our inquiry not on Ames's misdemeanor crime of obstruction but instead on the serious—indeed, life-threatening—situation that was unfolding at the time. Ames was prolonging a dire medical emergency through her disregard of Deputy Volpe's lawful commands, and her actions risked severe consequences. Because the gravity of Deputy Volpe's community caretaking responsibilities under these circumstances must be factored into the analysis, we conclude that the first *Graham* factor weighs in Deputy Volpe's favor.

The second—and most important—*Graham* factor examines whether Ames presented an immediate danger to Deputy Volpe or others. On this record, we have no difficulty in concluding that she did. In Deputy Volpe's words, as Ames and the Ebys loaded Briganti into Ames's truck, Deputy Volpe "continued to be highly concerned for Mr. Briganti's immediate survival" because he "appeared completely unconscious" and "needed immediate help." Deputy Volpe, still waiting for backup, and acting on instructions from her patrol supervisor to prevent Ames and Briganti from leaving so that the aid crew could commence treating Briganti at the scene, faced a rapidly escalating situation. After Deputy Volpe blocked Ames's truck with her vehicle, commanded Ames to stop, and declined to move her

vehicle, Ames yelled at the Deputy to "Move your f-ing vehicle" and "Get out of my way" as she started to put her keys in the ignition and reached to close the truck door.

Ames admitted she was "panicked," and testified that she "got angry" when Deputy Volpe told her she could not leave with Briganti. Deputy Volpe was concerned that Ames would further delay Briganti's access to urgently needed medical care. In light of these circumstances, a reasonable officer on the scene could conclude, as Deputy Volpe did here, that Ames presented an immediate danger. As a result, the second *Graham* factor weighs in favor of Deputy Volpe.

The third *Graham* factor also favors Deputy Volpe because undisputed evidence in the record demonstrates Ames was actively interfering with Briganti's medical treatment, physically resisting arrest, and attempting to evade Deputy Volpe by flight. Ames admits Deputy Volpe told her it was unlawful to leave with Briganti and that Ames responded by yelling obscenities and indicating her intent to drive away with him. Ames also testified she grabbed the steering wheel with her right hand when Deputy Volpe began pulling her out of the truck. Finally, Ames described being unable to give Deputy Volpe her right arm to be cuffed despite Deputy Volpe's repeated requests. Even if this was because Ames's arm was pinned beneath her body, from Deputy Volpe's perspective it reasonably appeared that Ames was still refusing to comply with her requests as part of her ongoing resistance to the officer's commands. On these facts, the use of force to effect her arrest may have been mistaken, but was not unreasonable.

On balance, we conclude the government interests at stake—here, Briganti's urgent need for life-saving emergency

medical care and the need to protect the first responders and other motorists from potential harm—outweighed any intrusion on Ames's Fourth Amendment rights. We think Deputy Volpe's use of force in this case was reasonable in response to the totality of the circumstances. She needed to make a split-second decision during rapidly evolving circumstances to disable Ames. Deputy Volpe did not know whether Ames had access to a weapon in the truck. Ames refused Deputy Volpe's commands, resisted being pulled from her truck, and (whether or not by choice) was not submitting to being handcuffed. Even were we to conclude Deputy Volpe was mistaken in the judgments she made as to the amount of force required, as a matter of law her actions did not rise to the level of plain incompetence or a knowing violation of clearly established law regarding police actions in response to this serious medical emergency. *See Stanton*, 134 S. Ct. at 5, 7. Accordingly, Deputy Volpe is entitled to qualified immunity from Ames's excessive force claim.

**B**

Deputies Sawtelle and Christian are also entitled to qualified immunity from Ames's unlawful search claim under the "emergency doctrine." We previously have recognized that officers acting in their community caretaking capacities and responding to a perceived emergency may conduct certain searches without a warrant or probable cause. *See Stafford*, 416 F.3d at 1073–74. To determine whether the emergency exception applies to a particular warrantless search, we examine whether: "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet

the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Here, the deputies' search of Ames's truck falls within the emergency exception.

Deputy Sawtelle had an objectively reasonable basis for concluding Ames's truck needed to be searched in order to protect Briganti from serious harm—in this instance, the life-threatening harm Briganti faced as a result of his drug overdose.[5] When Deputy Sawtelle arrived on the scene in response to Deputy Volpe's request for backup, he understood the truck to be a possible overdose scene based on the fact that Briganti had been in the pickup prior to Deputy Sawtelle's arrival and his knowledge of the presence of the suicide note inside the truck. Deputy Sawtelle explained that it is common practice for officers responding to an attempted suicide call involving a drug overdose to search locations associated with the suicide victim in order to find out what drugs were used in the suicide attempt. The County's expert further explained: "When a patient has ingested an unknown drug or combination of drugs the need to identify toxins and other potential health hazards is a top priority and is very time sensitive." We agree with the district court that, given what Deputy Sawtelle knew when he first arrived at the scene, he had an objectively reasonable basis for concluding there was an immediate need to search the truck to find the medications Briganti took in his overdose.

---

[5] The record demonstrates Deputy Christian assisted in the search of the truck at Deputy Sawtelle's direction, and does not indicate Deputy Sawtelle instigated the search in response to a request by Deputy Volpe. Accordingly, the relevant inquiry is whether Deputy Sawtelle had an objectively reasonable basis to conclude the truck needed to be searched for evidence of what Briganti had ingested.

We part ways with the district court on the question whether the scope of the truck search was reasonable to meet the need Deputy Sawtelle identified. We conclude it was reasonable for Deputy Sawtelle to search the glove compartment of the truck, given that the specific purpose of the search was to assist in Briganti's medical care by finding any medications or drugs he had taken, and that medications and drugs easily can be stored in a glove compartment. Significantly, Deputy Sawtelle stated that he was not "investigating a crime, nor operating to gather evidence of a crime" when he conducted his search of the truck, nor did the search lead to any charges against either Ames or Briganti. Moreover, although Deputy Sawtelle has no specific memory of informing the aid crew of the prescription medications and suicide note he found in the truck, he testified it was his standard practice to do so.

Ames has put forward no evidence to contradict Deputy Sawtelle's testimony, nor to suggest he was searching her truck for any purpose other than to assist the emergency care for Briganti's suicide attempt. Instead, Ames claims that if Deputy Sawtelle were really motivated by such a purpose, he would have searched Briganti's apartment as well. This argument—in essence, that the deputies' search was unreasonably *narrow* in scope—is insufficient to defeat summary judgment because it is not evidence that creates a genuine dispute of material fact. The deputies' search of the truck in furtherance of their duties to assist in resolving an active medical emergency, including the search of the glove compartment, did not violate the Fourth Amendment.

**V**

Deputy Volpe's use of force while discharging her community caretaking function was objectively reasonable in light of the unfolding emergency with which she was faced. As the lone law enforcement officer on the scene, responsible for assuring the safety of Briganti, Ames, the first responders, and other motorists, Deputy Volpe needed to act quickly to disable the clearly panicked mother from leaving with her gravely ill son and enable the aid crew immediately to treat Briganti. The level of force Deputy Volpe employed to remove Ames from the truck and apply handcuffs did not rise to the level of a constitutional violation under these circumstances. Likewise, Deputies Sawtelle and Christian did not violate Ames's Fourth Amendment rights when they searched her truck in an attempt to find the medications Briganti had ingested in his overdose. The deputies' actions were reasonable under the emergency doctrine and they are entitled to qualified immunity from suit.

That portion of the district court's order denying qualified immunity on Ames's excessive force and unlawful search claims is **REVERSED** and the case is **REMANDED** to the district court for entry of an order of dismissal.

Each party shall bear its own costs.