**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DERRICK SANDERLIN; CAYLA SANDERLIN; BREANNA CONTRERAS; PIETRO DI DONATO; ADIRA SHARKEY; JOSEPH STUKES; VERA CLANTON, | No. 23-15487 D.C. No. 5:20-cv-04824-BLF |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| JASON DWYER; LEE TASSIO; JONATHAN MARSHALL; MICHAEL PANIGHETTI; JUAN AVILA, | |
| *Defendants-Appellants*, | |
| and | |
| CITY OF SAN JOSE; EDGARDO GARCIA; JARED YUEN; JONATHAN BYERS; RONNIE A. LOPEZ; BRIAN MATCHETT; AIDAN GUY; STEVEN GAONA; TYLER MORAN, | |

*Defendants*,

v.

NAACP OF SAN JOSE/ SILICON VALLEY,

*Third-party-plaintiff.*

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted May 7, 2024
San Francisco, California

Filed September 4, 2024

Before:  Richard A. Paez, Jacqueline H. Nguyen, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Qualified Immunity / Retaliatory and Excessive Force

The panel affirmed the district court's denial of qualified immunity to San Jose Police Officer Michael Panighetti in Derrick Sanderlin's 42 U.S.C. § 1983 action alleging that Panighetti used retaliatory and excessive force against him in violation of his First and Fourth Amendment rights.

While attending a protest, Sanderlin was struck in the groin by a 40mm foam baton round, fired directly at him by Panighetti.

The panel held, that viewing the evidence in the light most favorable to Sanderlin, genuine disputes of material fact existed as to whether Panighetti's use of force was retaliatory in violation of the First Amendment because (1) resolving the disputed facts in Sanderlin's favor, he was engaged in the protected activity of peacefully protesting, and (2) it is clearly established that police officers may not use their authority to retaliate against individuals for protected speech.

The panel held, that viewing the evidence in the light most favorable to Sanderlin, genuine disputes of material fact existed as to whether Panighetti's use of force was excessive in violation of the Fourth Amendment because (1) Panighetti's act of firing a projectile at Sanderlin constituted a seizure under the Fourth Amendment, (2) a triable issue of fact existed as to the reasonableness of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

force used by Panighetti, and (3) although subsequent legal developments narrowed the scope of seizures under the Fourth Amendment, the right violated was clearly established at the time of the incident.

## COUNSEL

Sarah E. Marinho (argued), Marinho Law Firm, San Jose, California; Dmitry Stadlin, Stadlin Law Firm PC, San Jose, California; for Plaintiffs-Appellees.

Ardell Johnson (argued); Matthew Pritchard, Sr., Deputy City Attorney; Nora Frimann, City Attorney; Office of the City Attorney, San Jose, California; for Defendants-Appellants.

## OPINION

NGUYEN, Circuit Judge:

In the summer of 2020, millions took to the streets to protest the death of George Floyd at the hands of a Minneapolis police officer. Plaintiff Derrick Sanderlin attended one such protest in San Jose, California. While in attendance, Sanderlin was struck in the groin by a 40mm foam baton round, fired directly at him by Officer Michael Panighetti.

Sanderlin sued, alleging that Panighetti's use of force was retaliatory in violation of the First Amendment and was excessive in violation of the Fourth Amendment. Panighetti moved for summary judgment, arguing that he was entitled

to qualified immunity. The district court denied Panighetti's motion, concluding that genuine disputes of material fact existed as to whether Panighetti violated Sanderlin's clearly established rights.

We agree. Viewing the evidence in the light most favorable to Sanderlin, as we must at this stage of the proceedings, genuine disputes of material fact exist as to whether Sanderlin's First and Fourth Amendment clearly established rights were violated. We therefore affirm the district court's denial of qualified immunity.

## Background

### A. Factual History

On May 29, 2020, at around 2:00 p.m., a protest started at San Jose City Hall. Police officers patrolling the scene initially reported that the crowd remained peaceful for the first hour or so. The crowd eventually marched from City Hall down Santa Clara Street onto Highway 101, temporarily blocking both northbound and southbound lanes. Additional officers were dispatched to assist in the response, as some members of the crowd began engaging in violent behavior, including smashing vehicles with rocks and throwing objects at officers from an overpass.

When Officer Panighetti arrived on the scene at around 3:30 p.m., he was equipped with a 40mm launcher, capable of firing foam baton rounds. According to then-existing San Jose Police Department (SJPD) policy, SJPD officers had blanket authority to use 40mm foam baton rounds throughout the protests as defensive weapons against "specific individuals who posed a threat of serious injury to the officers or others."

At about 4:30 p.m., officers issued dispersal orders to the crowd. The crowd then began to make its way back toward City Hall, westbound on Santa Clara Street. Panighetti was with a group of police officers who followed the protestors in a patrol vehicle back in the direction of City Hall. When Panighetti reached the intersection of Santa Clara Street and 8th Street, he was instructed to get out of his vehicle and stand behind the skirmish line that began to form. According to Panighetti, protestors began throwing various objects at him and other police officers.

Panighetti and other officers continued moving in the direction of City Hall. Panighetti testified in his deposition that as he approached the intersection of Santa Clara Street and 5th Street, he had been monitoring an individual wearing a San Francisco 49ers jersey who had been throwing objects at police officers and hiding behind corners. When they reached the intersection, Panighetti observed that individual in the 49ers jersey, along with another person, hiding behind the corner of a building. Panighetti claimed that he was able to continue to visually monitor the two subjects because the building was glass all around the first floor. Panighetti then explained that he saw those two subjects holding gallon paint cans, and he believed they were poised to throw the paint cans at police officers. At one point, the subjects pushed a dumpster into the intersection and attempted to hide behind it.

At that point, a man later identified as Sanderlin moved into the sidewalk while carrying a sign over his head. Panighetti claimed that Sanderlin purposefully placed himself in front of officers to block the two subjects holding paint cans and hiding behind the dumpster. In video footage captured by Panighetti's body-worn camera, Sanderlin is seen standing on the sidewalk holding a sign, and a dumpster

is behind him. The video does not clearly show the two subjects allegedly holding paint cans that Panighetti describes, though there is clearly a chaotic scene unfolding around this encounter. In the video, Panighetti can be heard yelling to Sanderlin, "I'm going to hit you, dude. You better move!" Sanderlin fails to immediately comply, continuing to stand in the sidewalk holding his sign over his head. After only a few seconds, Panighetti fires a 40mm foam baton at Sanderlin, striking him in the groin area. Sanderlin recoils from the impact and appears to take a few steps, shifting his weight between his feet in pain. He then limps out of the middle of the sidewalk, at which point he is no longer visible in the video footage.

According to Sanderlin, he and his wife, co-plaintiff Cayla Sanderlin, attended the protest on May 29 together. His wife indicated that she wanted to leave, but Sanderlin felt compelled to stay to show solidarity with his fellow demonstrators. At around 6:20 p.m., Sanderlin was standing near the intersection of East Santa Clara Street and 5th Street. In his declaration, Sanderlin stated that he was not posing a threat nor was he invading the personal space of any officers or attempting to shield any subjects from the police. Sanderlin stated he was merely standing with his hands over his head, imploring the officers to stop shooting other protestors. Sanderlin further stated he did not hear any warnings or instructions to move at the time he was shot by Panighetti. Sanderlin asserted that after Panighetti shot him, he fell to the ground immobile, and no officers rendered aid. His wife found him lying alone near the intersection of East Santa Clara Street and 5th Street, and she helped him stand and walk away. As a result of being shot in the groin, Sanderlin suffered severe injuries that required emergency surgery.

## B. Procedural History

Sanderlin filed suit against Panighetti under 42 U.S.C. § 1983, alleging that Panighetti had used excessive force against him because he was protesting the police and that Panighetti's acts therefore violated his rights under the First and Fourth Amendments of the United States Constitution.[1] Panighetti moved for summary judgment on both claims. Regarding the First Amendment claim, Panighetti argued that his motivation for shooting Sanderlin was not retaliatory. Regarding the Fourth Amendment claim, Panighetti argued (1) that Sanderlin was not seized within the meaning of the Fourth Amendment, (2) that if there was a seizure, his use of force was not excessive, and (3) that he is entitled to qualified immunity because he did not violate clearly established law.

The district court rejected each of these arguments and denied Panighetti qualified immunity. As to Sanderlin's First Amendment claim, the district court determined that a jury could credit circumstantial evidence to find that Panighetti was motivated by retaliatory animus. As to whether Sanderlin was seized, the district court concluded that although Panighetti's stated subjective intent was to disperse Sanderlin, rather than restrain him, that fact was not determinative of whether there was a seizure. The district court reasoned that because "Panighetti intentionally aimed and fired at Derrick Sanderlin," that was sufficient to create a dispute of fact as to whether there was a Fourth Amendment seizure. The court then went on to conclude

---

[1] We resolve the claims brought by Sanderlin against Defendant Jason Dwyer in a concurrently filed memorandum disposition. Sanderlin brought additional claims against other defendants, none of which are at issue in this appeal.

that whether Panighetti's use of force was excessive would "depend largely on how the jury interprets the video footage, and whether the jury credits Panighetti's testimony that Sanderlin was blocking the police from targeting the two individuals behind the dumpster." And finally, the district court concluded that "it was clearly established that an officer could not shoot a projectile at an individual who was peacefully protesting," and thus, under Sanderlin's version of events, "Panighetti had notice that his shooting of Sanderlin would be unconstitutional."

Panighetti timely appealed.

## Jurisdiction and Standard of Review

We have jurisdiction over this interlocutory appeal of the district court's summary judgment order denying qualified immunity. 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But, at this stage, our jurisdiction is "limited to resolving a defendant's 'purely legal . . . contention that [his or her] conduct did not violate the [Constitution] and, in any event, did not violate clearly established law.'" *Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (alterations in original) (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018)). We lack jurisdiction over any argument "that the evidence is insufficient to raise a genuine issue of material fact." *Id.* In reviewing the denial of summary judgment on qualified immunity grounds, we "decide de novo whether the facts, 'considered in the light most favorable to the plaintiff,' show that qualified immunity is warranted." *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (quoting *Ames v. King County*, 846 F.3d 340, 347 (9th Cir. 2017)).

## Discussion

"Qualified immunity shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was 'clearly established' at the time of the violative conduct." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To survive summary judgment, Sanderlin must succeed on both prongs. *Id.*

We consider Sanderlin's First and Fourth Amendment claims in turn.

### I.

To establish a claim for retaliatory violation of the First Amendment, Sanderlin must show (1) that he was engaged in a constitutionally protected activity; (2) that Panighetti's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity;" and (3) that "the protected activity was a substantial or motivating factor in [Panighetti's] conduct." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

Panighetti argues that there are no genuine disputes of material fact as to the first and third elements. As to the first, Panighetti argues that Sanderlin was blocking Panighetti and other officers from taking action against the suspects standing behind the dumpster. Such obstruction of officers in their official duties, Panighetti argues, is not a constitutionally protected activity. But that argument assumes the truth of Panighetti's version of the facts, and at this stage of the proceedings, we must construe the evidence in the light most favorable to Sanderlin. *See Hopson*, 71 F.4th at 697. Whether or not Sanderlin was in fact

obstructing officers, rather than engaging in the protected activity of peacefully protesting, will turn on whether a factfinder eventually credits Panighetti's description of the circumstances surrounding the shooting.  According to Sanderlin, he was merely standing peacefully on the sidewalk holding the sign.  Resolving the disputed facts in Sanderlin's favor, he was engaged in protected First Amendment activity.

That brings us to the third element, which also turns on the same dispute of fact.  If a factfinder concludes that there was no legitimate justification for Panighetti's actions, they could reasonably infer that those actions were motivated by retaliatory animus.  *See Index Newspapers LLC*, 977 F.3d at 827 (recognizing that whether officer is motivated by discriminatory animus "involves questions of fact that normally should be left for trial"); *Duran v. City of Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (denying summary judgment on First Amendment claim where officer claimed he lacked retaliatory motive but reasonable juror could find traffic stop was retaliatory in absence of "legitimate, articulate" reason for traffic stop).

For these reasons, we agree that, when all factual disputes are resolved and all reasonable inferences are drawn in Sanderlin's favor, Panighetti's acts violated clearly established law.  It is clearly established that police officers may not use their authority to retaliate against individuals for protected speech.  *See Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019).  If a factfinder determines that Panighetti's actions were retaliatory, then Panighetti's actions would violate clearly established law.

## II.

We now turn to Sanderlin's Fourth Amendment claim of excessive force.

## A.

We must first decide whether Sanderlin was seized within the meaning of the Fourth Amendment. *See Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) ("Before addressing [an officer's] use of force, we must decide whether [the plaintiff] was seized, thereby implicating the Fourth Amendment.").

A seizure "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989). The Fourth Amendment is intended to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976). Thus, a seizure occurs any time an "officer accosts an individual and restrains his freedom to walk away." *Terry*, 392 U.S. at 16. "[A] mere touch can be enough for a seizure," and "brief seizures are seizures all the same." *Torres*, 592 U.S. at 317–18.

Consistent with these principles, courts have not hesitated to hold that a seizure occurred when an officer uses physical force in any way that restricts or otherwise limits the ability of an individual to move about freely, even if the restriction is limited in nature or time, and even where the

force is not applied for the purpose of effectuating an arrest. *See, e.g.*, *Salmon v. Blesser*, 802 F.3d 249, 254 (2d Cir. 2015) (holding that a seizure occurred where officer used "painful force to control [the plaintiff's] movements"); *Hess v. Garcia*, 72 F.4th 753, 763 (7th Cir. 2023) ("Physically grabbing someone is likely to be a seizure because it is likely to restrict movement, at least briefly."); *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) (holding that a seizure occurred where sheriff physically grabbed plaintiff's wrist for brief time); *United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir. 2020) (recognizing that "officers need not totally restrict a citizen's freedom of movement" to effectuate seizure (quoting *United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015)).

Here, Panighetti intentionally used physical force by directly firing a foam baton round at Sanderlin. According to Sanderlin's declaration, after he was struck with the foam baton, he fell to the ground unable to move. The video footage from Panighetti's body camera provides some corroboration for this claim, as Sanderlin can be seen staggering from the impact, unable to stand or walk properly. In other words, Panighetti intentionally applied physical force, and as a result, Sanderlin's "freedom of movement [was] restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Viewing the evidence in the light most favorable to Sanderlin, we conclude that a reasonable factfinder could determine that he was seized within the meaning of the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized . . . when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." (citations, quotation marks, and emphasis omitted)). The fact that Panighetti's

incapacitation of Sanderlin may have been limited in duration does not alter this conclusion, because a "meaningful interference" with an individual's freedom of movement, even if brief, constitutes a seizure. *United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984)). Nor is it relevant that Sanderlin was ultimately able to walk away, because "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Torres*, 592 U.S. at 325.

Panighetti argues that he could not have seized Sanderlin because his actual intent in firing the foam baton was to force him to leave the area, not to restrain Sanderlin or apprehend him. Panighetti is correct that under the Supreme Court's recent decision in *Torres*, "[a] seizure requires the use of force *with intent to restrain*." *Id.* at 317. But *Torres* is equally clear that our inquiry centers on "whether the challenged conduct *objectively* manifests an intent to restrain." *Id.*; *see also Brendlin*, 551 U.S. at 260 ("[W]e have repeatedly rejected attempts to introduce . . . subjectivity into Fourth Amendment analysis."); *accord Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) ("The intent that counts under the Fourth Amendment is the intent conveyed, not the officers' subjective intent." (quotation marks omitted)).

Viewing the facts in the light most favorable to Sanderlin, we conclude that a reasonable factfinder could find that Panighetti *objectively* manifested an intent to restrain Sanderlin and prevent Sanderlin from freely walking away. Record evidence suggests that the 40mm launcher that Panighetti used is chiefly designed, intended, and used for the purpose of incapacitating its target—and there can be

no reasonable dispute that "incapacitating" an individual by firing a projectile at them is an act that "meaningful[ly] interfere[es]" with their freedom of movement. *Jacobsen*, 466 U.S. at 113 n.5 (citing cases that recognize that "meaningful interference, however brief, with an individual's freedom of movement" constitutes a seizure). According to SJPD training materials, "Less Lethal Impact munitions" like the 40mm foam baton Panighetti fired "are used to: Disorient [and] *Incapacitate . . .* Injury should be expected."    The training materials further reveal that projectiles that are fired "to 'Center Mass' provide for the highest probability of causing immediate incapacitation, but also have the potential to cause serious injury or death." Panighetti himself explained that he was trained to use the 40mm launcher "to incapacitate a suspect" posing a safety risk.  The record also shows that the groin, where Sanderlin was shot, is considered an area of particularly high risk of injury, and the training materials specifically indicate that "[t]he groin area should not be intentionally targeted."

The method of force Panighetti used is, by its nature, intended to incapacitate its target, thereby making it difficult to freely walk away.  A reasonable trier of fact viewing this evidence could conclude that by firing a 40mm projectile at Sanderlin's groin, Panighetti objectively manifested an intent to restrain Sanderlin.  Whether Panighetti may have subjectively intended to repel Sanderlin rather than restrain him is irrelevant to the analysis.

We therefore conclude that Panighetti's act of firing a projectile at Sanderlin constituted a seizure under the Fourth Amendment.

### B.

Having determined that Sanderlin was seized within the meaning of the Fourth Amendment, we must now consider whether the seizure was unreasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). In assessing whether a seizure is unreasonable, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). We note at the outset that "[b]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). "When all disputes of fact are resolved in [Sanderlin's] favor, as they must be for purposes of summary judgment, it is apparent that application of the *Graham* factors would *not* have *required* a rational jury to decide that" Panighetti's use of force was reasonable. *Id.* at 1441.

With respect to Sanderlin's interests, we consider "the type and amount of force inflicted" against him. *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). The district court noted that a projectile weapon like the 40mm launcher is a particularly strong method of force. Panighetti does not, and could not, reasonably dispute this. The SJPD manual describes the 40mm launcher as capable of causing serious injury or death. Moreover, there is no dispute that the injuries Sanderlin sustained were severe. Accordingly, we consider Panighetti's use of force to be "a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest." *Id.* at 1162–63.

In evaluating the government's interest in the use of force, we "take[] into account: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Chew*, 27 F.3d at 1440 (citing *Graham*, 490 U.S. at 396). The district court correctly noted that Sanderlin was not committing any crime at the moment Panighetti shot him. Although a chaotic scene was unfolding around him, Sanderlin was peacefully holding a sign with his hands up, was not personally threatening officer safety, and was not evading arrest.

On the other hand, officers obviously have a legitimate "safety interest in controlling" a mass of people. *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001). We acknowledge that the reasonableness inquiry must account for the reality that officers in Panighetti's situation are "often forced to make split-second judgments" in "rapidly evolving" circumstances. *Graham*, 490 U.S. at 397. And where police officers are confronted with a crowd of protestors who refuse to obey the officers' commands to disperse, the application of minimal force may be justified to maintain order and prevent organized lawlessness. *See Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). Panighetti argues that Sanderlin posed a significant and immediate risk to officer safety because he interfered with the officers' ability to incapacitate the two dangerous suspects hiding behind the dumpster, who Panighetti claims were armed with gallon paint cans. Once again, however, Panighetti relies on his version of the disputed facts. Whether or not Sanderlin was in fact obstructing officers will turn on whether a factfinder credits Panighetti's version of the events.

Moreover, the cases Panighetti cites are factually distinguishable, and none compel the conclusion that the force Panighetti used was reasonable as a matter of law. In *Jackson*, officers sprayed the plaintiff with a chemical irritant after the plaintiff ran to interfere with an officer in the middle of an altercation. 268 F.3d at 650. There, the threat posed by the plaintiff was direct, while the corresponding intrusion on her Fourth Amendment rights was less severe. In *Ames*, the plaintiff refused to allow police officers to enter her garage with an aid crew to provide lifesaving treatment to her son, loaded her son in a car, and attempted to drive away with him despite the officers' orders not to do so. 846 F.3d at 345. There, the plaintiff actively interfered with her son's medical treatment and physically resisted arrest. *Id.* at 349. And in *Felarca*, we specifically noted that the plaintiffs understood the police officers' dispersal orders, ignored or dismissed them, and directly interfered with the officers' attempt to carry out their duties. 891 F.3d at 818. In contrast, Sanderlin claims that he never heard Panighetti's commands to move, and that he never attempted to threaten or invade the officers' personal space.

Ultimately, on this record, the reasonableness of the force used by Panighetti thus turns on "how the jury interprets the video footage, and whether the jury credits Panighetti's testimony that Sanderlin was blocking the police from targeting the two individuals behind the dumpster." To the extent that the jury discredits Panighetti's account or believes that Panighetti failed to consider other less intrusive tactics, it could determine that the use of force was unreasonable. We therefore affirm the district court's conclusion that a triable issue existed as to whether Panighetti violated Sanderlin's Fourth Amendment rights.

C.

We now turn to the second prong of qualified immunity—whether the right violated was "clearly established." We ask whether the law was "clearly established *at the time an action occurred*." *Harlow*, 457 U.S. at 818 (emphasis added). Subsequent legal developments cannot be used to impute knowledge upon officers, because the relevant inquiry is what the officer can "fairly be said to 'know'" at the time of the alleged violation. *Id.*; *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam))).

We must therefore decide whether at the time of the conduct, under clearly established law, Panighetti's use of force was excessive. We confronted similar facts in *Nelson v. City of Davis*. There, the police ordered a group of students at a large disturbance to disperse, and when the students failed to comply, the police fired pepperball projectiles at them. *Nelson*, 685 F.3d at 873–74. We held that "the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors . . . constitute[d] unreasonable force in violation of the Fourth Amendment." *Id.* at 886. Given the factual similarities between *Nelson* and this case, Panighetti was on notice that his use of force was excessive.

Moreover, in determining that the officers in *Nelson* violated clearly established law by firing projectiles and

pepper spray at non-threatening individuals, we relied on our prior holding in *Deorle*.  In that case, we held that

> [e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.

*Deorle*, 272 F.3d at 1285; *see also Ciminillo v. Streicher*, 434 F.3d 461, 466–69 (6th Cir. 2006) (finding an officer "was on notice that it is unreasonable to use beanbag propellants against individuals who pose no immediate risk to officer safety," even when the shooting occurred during the course of a riot).  A reasonable trier of fact could conclude that each of these factors were present here, rendering Panighetti's conduct unreasonable under clearly established law.

A closer question, however, is whether we may rely on *Nelson* to hold that it was clearly established that Panighetti's acts constitute a seizure under the Fourth Amendment.  If it were appropriate to rely on *Nelson*, it would be clearly established.  In *Nelson*, we explained that "it was clearly established prior to April 2004 . . . that the intentional application of force which terminates an individual's freedom of movement results in a seizure."  685 F.3d at 884.  But *Nelson*'s holding has been limited by the Supreme Court's subsequent decision in *Torres*, in which the

Court held that the mere "intentional application" of force is not, by itself, sufficient to establish a seizure; the force must be applied with the intent to restrain. We have already explained that the use of force here was a seizure under the narrower rule in *Torres*. But we must determine whether we can nevertheless rely on *Nelson*'s broader rule as clearly establishing, as of May 29, 2020, that intentionally firing a less lethal projectile to incapacitate a suspect constitutes a seizure.

We hold that such reliance is proper. The "clearly established" inquiry that we undertake when evaluating an officer's assertion of qualified immunity is bound up with the precept of notice—notice means *prior* notice, not notice after the fact. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."). For that reason, a court may not rely on "subsequent legal developments" favorable to the plaintiff to clearly establish the law, because the officer cannot "fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818; *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 685 (9th Cir. 2021) (Collins, J., concurring in the judgment in part and dissenting in part) ("Changes in the applicable law that occur *subsequent* to the [defendant's] actions are 'therefore of no use in the clearly established inquiry.'" (quoting *Kisela*, 584 U.S. at 107)).

*Torres* is, in some sense, favorable to Panighetti, because it narrowed the scope of seizures under the Fourth Amendment to cover only force used to restrain (even though, taking the facts in the light most favorable to Sanderlin, the use of force here meets that standard, as explained above). But we see no reason to treat subsequent

legal developments that are favorable to the defendant officer any differently from subsequent legal developments favorable to the plaintiff.  As one of our sister circuits has already recognized, "the need for prior notice is a two-way street."  *West v. Murphy*, 771 F.3d 209, 214 (4th Cir. 2014). In *West*, the Fourth Circuit considered whether a Supreme Court case narrowing liability for officials that was decided *after* the defendant officials' challenged conduct could be used to show that the law was not clearly established at the time of the challenged conduct.  *Id.*  Recognizing that "the inquiry into 'clearly established law' is tethered to the need for notice," the Fourth Circuit held that subsequent legal decisions that inure to the benefit of government officials "do[] not affect whether the law was clearly established because the favorable judicial decision could not have informed the officials' understanding of whether their actions were lawful."  *Id.*

We adopt our sister circuit's reasoning here.  Consistent with well-settled principles underpinning qualified immunity, neither favorable nor damning subsequent legal developments can be used to demonstrate what law was or was not clearly established at the time of an officer's challenged conduct.  A subsequent legal development could narrow the scope of a once broader constitutional right or otherwise work a change into the legal framework for analyzing a previously clear area of law.  But just as we cannot reasonably expect an officer to anticipate subsequent legal developments to render his actions unlawful, *Harlow*, 457 U.S. at 818, we cannot presume that an officer acts with clairvoyance that precedent clearly defining a constitutional right may later be disturbed.  Of course, in assessing an officer's claim of qualified immunity, decisions post-dating the incident may elucidate whether the officer has committed

a constitutional violation at all—if there is no violation, then there is no liability. But if there is a violation, the officer cannot take advantage of subsequent developments in the law to argue that the right was not clearly established at the time he committed the violation. This rule is not only a faithful application of qualified immunity precedent, but a practically necessary one as well. If an officer acts with the sincere belief that his actions are lawful, notwithstanding clear law to the contrary in effect at the time, it would make little sense to reward the officer if it turns out that the law later becomes less clear or changes in some other way.[2]

As of May 29, 2020, *Nelson* clearly established that Panighetti's act of shooting Sanderlin constituted a seizure. *Nelson* and *Deorle* together clearly established that Panighetti's use of force under the circumstances was unreasonable. We therefore affirm the district court's denial of summary judgment on qualified immunity grounds.

\*\*\*

We **AFFIRM** the district court's order denying qualified immunity to Panighetti.

---

[2] We add that the Supreme Court's ruling in *Torres* would not have changed the outcome in *Nelson*. Were we to decide *Nelson* today, we would reach the same result, albeit for an analytically different reason. Although it is insufficient that the act causing the seizure be "intentional," *Torres* still requires us to focus on the officer's objectively manifested intent. And in *Nelson*, the officers' objectively manifested an intent to restrain by firing projectile pepperballs into the crowd, knowing there was a significantly high risk that one such projectile could strike and incapacitate a member of the group. Thus, even after *Torres*, the officers' acts in *Nelson* constituted a seizure. That we reach the same result under a different analytical framework based on intervening legal developments has no bearing on whether a reasonable officer would be on notice based on *Nelson* that his actions would constitute a seizure.